IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AIMEE C. GEDULDIG, | : | No. 3:13cv2020 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner | : | |
| of Social Security Administration, | : | |
| Defendant | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## **MEMORANDUM**

Before the court for disposition is Plaintiff Aimee C. Geduldig's (hereinafter "plaintiff") appeal of the Defendant Commissioner of Social Security Administration's (hereinafter "defendant") denial of her application for Social Security Disability Insurance Benefits (hereinafter "DIB"). The matter has been fully briefed and is ripe for disposition.

**Background**

Plaintiff worked as a Special Education Teacher for the State College Area School District, beginning in August 1998. (Doc. 2, Administrative Record (hereinafter "R.") at 40). She testified that she resigned that position on November 30, 2009, after she, the District's superintendent, the director of special education, and the District's attorney determined that her health issues were negatively affecting her

job performance. (R. at 34, 38). Plaintiff reported that she was missing work due to pain, and that the pain she experienced made it difficult for her to focus on her required tasks. (R. at 38-39).

Plaintiff filed for DIB on November 3, 2009, claiming disability due to fibromyalgia, Meniere's Disease, depression, irritable bowel syndrome, migraine headaches, asthma, anxiety, attention deficit and hyperactivity disorder (hereinafter "ADHD"), and panic disorder with psychotic features. (R. at 14).

Plaintiff's claim was initially denied on February 18, 2010 (R. at 100), and plaintiff requested a hearing by an Administrative Law Judge (hereinafter "ALJ") (R. at 107). The ALJ convened a hearing on July 21, 2011, at which plaintiff appeared and testified. (R. at 12). In a decision issued November 17, 2011, the ALJ denied plaintiff's claim, finding that plaintiff was not "disabled" and thus not entitled to DIB. (R. at 21). Plaintiff requested review by the Appeals Council on January 20, 2012. (R. at 7). The Appeals Council denied plaintiff's request on January 27, 2013. (R. at 4). Plaintiff initiated the instant appeal by filing a complaint with this court on July 26, 2013. (Doc. 1).

**Jurisdiction**

The court has federal question jurisdiction over this Social Security Administration appeal.  See 42 U.S.C. § 1383(c)(3) ("The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."); see also 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.  Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business . . . .").

**Standard of Review**

In reviewing a Social Security appeal, this court must determine whether "substantial evidence" supports the ALJ's decision.  See, 42 U.S.C. § 405(g); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  The

United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  The Third Circuit Court of Appeals has explained that "substantial evidence has been defined as 'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate.'" Hagans, 694 F.3d at 292 (quoting Plummer, 186 F.3d at 427).

     The court should not reverse the Commissioner's findings merely because evidence may exist to support the opposite conclusion.  See 42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (stating that courts may not weigh the evidence or substitute its own conclusion for those of the fact-finder); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (indicating that when the ALJ's findings of fact are supported by substantial evidence, courts are bound by those findings, even if they would have decided the factual inquiry differently).  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial

evidence." Consolo, 383 U.S. at 620.

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981) and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008).  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

**Discussion**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any **substantial gainful activity** by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

5

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added). An individual is incapable of engaging in "substantial gainful activity" when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates DIB claims with a five-step sequential analysis. 20 C.F.R. §§ 404.1520(a)(4). This analysis requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity; (2) has an impairment, or combination of impairments, that is severe; (3) has an impairment or combination of impairments that meets or equals the requirements of a "listed impairment"; (4) has the "residual functional capacity" to return to his or her past work; and (5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(I)-(v). Prior to addressing step four, the ALJ must determine the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4)(iv). A plaintiff's residual functional capacity is "the most [the plaintiff] can still do despite [his]

6

limitations." 20 C.F.R. § 404.1545(a)(1).[1]

In applying the five-step sequential analysis in the instant case, the ALJ found the following: Step 1- the Plaintiff had not engaged in substantial gainful activity since October 28, 2009, the alleged onset date (R. at 14); Step 2- the Plaintiff does have the following severe impairments: fibromyalgia, Meniere's disease, irritable bowel syndrome, migraine headaches, asthma, anxiety, depression, ADHD, and a panic disorder with psychotic features (Id.); and Step 3- The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments (R. at 15).

The ALJ next determined plaintiff has the residual functional capacity (hereinafter "RFC") to:

> perform light work . . . except she requires a sit/stand option every 15-20 minutes. She can occasionally climb, bend, balance, stoop, kneel, crouch, crawl, and use ramps/stairs. The [plaintiff] can never use ladders, ropes, and scaffolds. . . . The [plaintiff] must avoid exposure to extreme heat, cold, humidity, wetness, pulmonary irritants, uneven heights, and dangerous machinery. The [plaintiff] is limited to simple, routine, repetitive tasks, involving no more than simple, short instructions and simple, work-related decisions with few work place

---

[1] If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

7

>changes.  Finally, the [plaintiff] is unable to work at production rate pace.

(R. at 17).  Then the ALJ proceeded to Step 4 of the sequential evaluation and concluded that plaintiff is unable to perform any past relevant work. (R. at 19).[2]

Timothy Mahler, an impartial vocational expert, testified at the hearing regarding jobs that someone with plaintiff's limitations, as defined by the ALJ, could perform.  Based upon the vocational expert's testimony, the ALJ concluded that, considering the plaintiff's age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that she can perform.[3]  Such jobs include office helper, mail room clerk, file clerk, and a labeler/marker.  (R. at 20).  Thus, the ALJ found that the plaintiff is not disabled from employment, but rather,"is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (R. at 20).

The plaintiff's appeal alleges that the ALJ erred in the following two

---

[2] The ALJ discussed plaintiff's past work as a special education teacher.  (R. at 19).

[3] Plaintiff was thirty-seven years of age at the time of the hearing. (R. at 19).

ways: 1) the ALJ ignored or did not properly evaluate all relevant evidence of record; and 2) the ALJ improperly evaluated plaintiff's subjective complaints, and the ALJ's finding that those complaints were not credible is not supported by substantial evidence. We will discuss these issues below.

**I.    Evidence of Record**

The first issue plaintiff raises is whether the ALJ evaluated all the relevant evidence of record. Plaintiff argues that the ALJ improperly ignored evidence from multiple medical providers. Specifically, plaintiff argues that the ALJ failed to discuss (1) a psychological intake evaluation performed by Dr. Deanne Swanson on August 1, 2011, as well as Dr. Swanson's therapy progress note dated August 18, 2011 (R. at 501-07); (2) a Functional Capacity Evaluation ordered by Dr. Brian Opperman and conducted by Tracy Everhart, an Outpatient Therapy Manager at HealthSouth, on September 8, 2011 (Tr. at 528-536); and (3) relevant portions of evidence provided by John Scipione, plaintiff's treating chiropractor, and Dr. Opperman, a rheumatologist. The court will address this evidence *in seriatim*.

**A. Dr. Deanne Swanson, LPC, Ph.D.**

Dr. Swanson reported on an Intake Assessment form, dated August 1, 2011, that the plaintiff presented with anxiety, and was vacillating between depression and anger. (R. at 501). Dr. Swanson diagnosed plaintiff with Depression NOS, and reported a Global Assessment of Functioning ("GAF") score of 45, which indicates serious psychological symptoms. (R. at 505-06). Dr. Swanson also noted that plaintiff reported that though her hobbies included activities such as gardening and reading, she could no longer participate in most activities due to her fibromyalgia. (R. at 503).

A review of the ALJ's decision (R. at 9-21) reveals that the ALJ failed to mention Dr. Swanson's Intake Assessment. The ALJ did not discuss the evidence noted above, much of which was contrary to the ALJ's findings and the evidence the ALJ did rely upon. For example, the ALJ relied heavily on the report of Dr. Dana Irwin, Ph.D. (See R. at 15-16). Dr. Irwin assigned plaintiff a GAF score of 60, which indicates more moderate symptoms than the score of 45 that Dr. Swanson assigned. The ALJ never explains why he rejects Dr. Swanson's GAF score in favor of Dr. Irwin's.[4]

---

[4] We note that the ALJ relied upon the evidence of Dr. Irwin, who only examined plaintiff once (R. at 403), to the exclusion of the evidence

**B. Functional Capacity Evaluation**

Dr. Brian Opperman referred plaintiff for a Functional Capacity Evaluation ("FCE"), which was conducted by Tracy Everhart, an Outpatient Therapy Manager at HealthSouth, on September 8, 2011. (R. at 528-36). Ms. Everhart reported that the plaintiff was referred to her to assess plaintiff's "current physical and functional capabilities with regards to her overall maximum physical capacity," and that the assessment consisted of a two and one-half hour functional capacity evaluation. (R. at 528). Based on this evaluation, Ms. Everhart reported that the plaintiff was functioning in the light category of work, and recommended that the plaintiff should "avoid crouching, squatting, crawling, kneeling, and ladder climbing." (Id.) Ms. Everhart further recommended that stooping, walking, sitting, and stair climbing should only be performed occasionally, and that the plaintiff requires frequent position changes in order to relieve pain. (Id.)

The ALJ mentioned Ms. Everhart's findings

---

provided by Dr. Swanson, who has apparently examined plaintiff at least twice (R. at 501, 507). This seems to conflict with the ALJ's reasoning for discounting Dr. Opperman's evidence, which was, in part, because he had only examined plaintiff once. (R. at 19). Dr. Opperman, however, is the only rheumatologist who has examined the plaintiff, and no comparable medical evidence exists in the record to contradict Dr. Opperman's opinions, whereas Dr. Irwin and Dr. Swanson are both mental health professionals, and Dr. Swanson's findings do contradict Dr. Irwin's.

11

only briefly, noting that though the plaintiff evidenced pain during the assessment, she also demonstrated the ability to sit with positional changes, good body mechanics, and upright posture.  The ALJ never discussed Ms. Everhart's recommendations, and failed to explain why he rejected the recommendations that plaintiff avoid kneeling, crouching, and crawling.  (R. at 17).  Further, the failure to consider the functional capacity evaluations findings and recommendations undermines the hypothetical scenario upon which the vocational expert based his testimony, which assumed an individual who could kneel, crouch, and crawl.  (R. at 77).  The court finds that the ALJ's failure to discuss Ms. Everhart's findings and recommendations is error, and calls into question both the basis of the vocational expert's testimony, and the ALJ's conclusions regarding plaintiff's residual functional capacity.

**C. John Scipione, D.C.**

John Scipione is a chiropractor who treated the plaintiff from February 2009 through July 2011.  Plaintiff contends that the ALJ erred in noting Mr. Scipione's statement that plaintiff's symptoms were improving during treatment, but worsened during a two month period during which plaintiff did not receive treatment from Mr. Scipione, without

acknowledging that the two month's hiatus from treatment was caused by dental work.  (See R. at 17-18).  Plaintiff further contends that the ALJ ignored evidence from Mr. Scipione regarding plaintiff's pain and trouble with repetitive motion, even with treatment.  (R. at 401; Pl.'s Br. at 11).

The ALJ's statement regarding the plaintiff failing to appear for a period of treatment is a factual statement, and its accuracy is not contested.  Therefore we find no error in that statement.  The ALJ's failure to address Mr. Scipione's evidence regarding plaintiff's pain and ability to move, however, is erroneous, especially in light of contradictory evidence from the same time period that was relied upon by the ALJ.  (See R. at 18 (citing to report of Dr. Daniel J. Kohane, which stated plaintiff was "well-appearing with normal strength and tone")).  The ALJ must consider and explain why he rejected Mr. Scipione's evidence.

**II. Credibility of Plaintiff's Subjective Complaints**

Plaintiff next asserts that the ALJ improperly evaluated plaintiff's subjective complaints.  The ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual capacity assessment."  (R. at 18).  The inconsistency the ALJ

found was rooted in the apparent conflict between what the ALJ described as plaintiff's claim of "totally debilitating symptomatology" and her "self-reported activities of daily living."  (Id.)

The ALJ detailed a "robust array" of self-reported, independent activities of daily living (R. at 17), such as driving, shopping, gardening, scrapbooking, reading, and caring for her daughter (R. at 18).  The ALJ further found that plaintiff has only moderate limitations in social functioning, based on what the ALJ cited as plaintiff's own report that she is able to "shop in stores, spends time with others, [and] has no problems getting along with family, friends, neighbors, or others."  (R. at 16).

To support his credibility determination, the ALJ cited to a document titled "Function Report - Adult," completed by plaintiff on January 18, 2010.  (R. at 245-55).  In the Function Report and accompanying Supplemental Function Questionnaire, plaintiff did report that she is responsible for the care of her daughter, that her hobbies and activities include snowboarding, gardening, scrapbooking, reading, and a search and rescue team, and that she engaged in playdates with friends and their children, dinners, visits with family, and other social and community activities.  (R. at 249). Inexplicably, however, the ALJ fails to mention that, in the same form (and

often on the same line), plaintiff details at great length the extensive negative effects that her symptoms have had on all of these daily activities.

For example, question 18 on the Function Report, "Hobbies and Interests," is divided into three subparts. (R. at 249). Part "a" asks what plaintiff's hobbies are, and plaintiff listed several activities. Part "b" asks how often plaintiff engaged in these activities, and plaintiff began her answer with, "<u>Prior to illness</u>" (emphasis in original) before listing the requested information. Finally, part "c" asks plaintiff to describe any changes in these activities since her illness, injuries, or conditions began, and plaintiff replied, "I am unable to garden or snowboard at all. I rarely read due to extreme fatigue [and] dizziness. Even scrapbooking takes more energy than I have." (R. at 249). The court cannot reconcile these answers with the ALJ's characterization that plaintiff self-reported that she gardens, scrapbooks, and reads despite her alleged symptoms.

The same is true of plaintiff's answers regarding social activities. Here too, Plaintiff qualified each answer regarding the time she spends with others with the phrase "Prior to illness," and described the current state of her social activities thusly: "No more playdates. At home 90% of

the time due to pain level. Unable to spend time with friends or participate in any activities." (R. at 250). Plaintiff also reported she "rarely talk[s] on [the] phone," because of fatigue. (Id.) The ALJ's description of plaintiff's self-reported social activities clearly does not reflect what she actually reported, and ignores conflicting evidence.

Similarly, most of the activities the ALJ named as those that plaintiff enjoys despite her alleged symptoms, are in fact described by plaintiff in the Functional Report as something plaintiff either can no longer do at all, or can do only with great difficulty. Driving: "When I am dizzy I am unable to drive and I must rely on friends to pick up my daughter from school." (R. at 248). Shopping in stores: "Can only shop for a little while before the pain [and] fatigue force me to stop." (Id.) Household chores: "Simple household chores have become impossible. I can't carry a laundry basket when it's full. I can't mow my lawn, changing the sheets makes me exhausted, and vacuuming is a nightmare." (R. at 252). Caring for her daughter:

> I'm too tired and in too much pain to cook dinner for my daughter. . . . Many evenings each week I have to lay in my bed because it's too painful for me to sit up. This means I am unable to care for my daughter, play with her, bathe her, and put her to bed.

(Id.)

16

Additionally, the ALJ failed to consider other activities that plaintiff reported have been negatively affected by her symptoms.  The plaintiff's reports on these activities further belie the notion of a "robust array of independent activities of daily living" on plaintiff's part.  Plaintiff reported a deterioration in her eating habits due to her symptoms.  "I cook and eat much less because it requires standing, moving around and chopping.  I am usually too exhausted and in too much pain."  (R. at 247).  "I can feed myself but I often skip meals because the preparation and eating of meals takes more energy than I have."  (R. at 246).  Plaintiff reported severe night sweats, and inability to sleep because of pain.  (Id.).  At times, plaintiff requires help using the toilet and bathing due to weakness or dizziness.  (Id.).

These negative effects on plaintiff's daily activities are reflected elsewhere in the record as well.  Dr. Swanson noted that plaintiff listed as hobbies gardening, snowboarding, and reading, "but cannot do most activities anymore due to fibromyalgia."  (R. at 503.)  Additionally, plaintiff described similar limitations on her activities to Tracy Everhart, to whom plaintiff reported that her ability to perform leisure activities was 5%, home activities was 50%, and work activities was 10%.  (R. at 530).

17

In fact, Ms. Everhart's observations further corroborated the plaintiff's descriptions of her pain and physical abilities.  The functional capacity evaluation reported that plaintiff could not tolerate a squatting position for sixty seconds, that plaintiff compensated for pain during the crawling exercise by using the back of her right hand, and that overall, throughout the thirty-minute positional tolerance circuit, plaintiff's "pain levels . . . increase[d] to 8/10 in her hip, low back, upper trapezius, and hands.  She was tearful frequently towards the end of the assessment due to her pain.  She reported each position tolerance increased her pain."  (R. at 532).  Ms. Everhart reported that the plaintiff provided a consistent effort throughout testing, and that plaintiff "provided a fully reliable report of pain and physical ability, which matched objective findings and clinical observations."  (R. at 530).  The ALJ never discussed these findings, nor explained why they were rejected in finding that plaintiff's statements were not credible.

We require from an ALJ "not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not

credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

> Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983), (quoting Gober v. Matthews, 574 F.2d 772 (3d Cir. 1978), internal quotation marks and citations omitted).

Here, objective medical evidence in the record may contradict the ALJ's finding that plaintiff's daily activities are robust and inconsistent with her claims of disability. The ALJ's opinion provides no basis for us to determine whether he considered these facts and rejected them, or merely ignored them altogether. On remand, the ALJ must consider all of this evidence, and explain his reasons for accepting some evidence and rejecting other evidence.

Upon reconsideration, the ALJ should bear in mind that pain in itself may be a disabling condition. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981). The Third Circuit Court of Appeals has explained that "even pain unaccompanied by objectively observable symptoms which is

nevertheless real to the sufferer and is so intense as to be disabling will support a claim for disability benefits." Taybron v. Harris, 667 F.2d 412, 415 (3d Cir. 1981) (internal citation omitted). Moreover, where pain complaints are supported by medical evidence, they should be given great weight, and when a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount a claimant's pain without contrary medical evidence. Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985).

**Conclusion**

For the above-stated reasons, the court finds that the ALJ's determination is not supported by substantial evidence. The ALJ failed to consider record evidence from multiple sources, and failed to explain why he rejected evidence that contradicts his credibility determination. We will remand this action to the ALJ for further consideration consistent with this memorandum. An appropriate order follows.

**Date: 9/12/2014**         **s/   James M. Munley**
                            **JUDGE JAMES M. MUNLEY**
                            **UNITED STATES DISTRICT COURT**